**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lafayette REDDRICK, Defendant–Appellant.**

No. 95–2965.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 7, 1996.

Decided July 25, 1996.

**1278**

Judith A. Stewart, Joshua J. Minkler, (argued), Office of U.S. Atty., Indianapolis, IN, for Plaintiff–Appellee.

Linda M. Wagoner, Indiana Federal Community Defenders, Inc., Indianapolis, IN, for Defendant–Appellant.

Before CUMMINGS, CUDAHY, and EASTERBROOK, Circuit Judges.

PER CURIAM.

Following a jury trial, Lafayette Reddrick was convicted of possession of cocaine base with intent to distribute, 21 U.S.C. § 841(a)(1), and of using or carrying a fire-

arm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c). Reddrick was sentenced to consecutive terms of 235 and 60 months, respectively, for these offenses.

Prior to trial, Reddrick moved to suppress evidence seized at his home and to suppress a statement he made to police following his arrest. The search was conducted pursuant to a search warrant, which Reddrick claimed was invalidly obtained. On appeal, Reddrick challenges the district court's denials of these motions. Reddrick also challenges the district judge's sentencing determination, presenting various arguments against the court's use of the crack guideline (rather than the guideline for powder cocaine) and complaining that the district court improperly enhanced his sentence for obstruction of justice. Finally, in a supplementary submission, Reddrick argues that his conviction for using or carrying a firearm during a drug trafficking crime must be reversed in light of the Supreme Court's recent ruling in *Bailey v. United States*, — U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). We vacate the firearm conviction but affirm in all other respects and remand the case to the district court for resentencing.

I. Factual Background

On April 28, 1994, police in Anderson, Indiana, obtained and executed a search warrant authorizing a search of Lafayette Reddrick's home for drugs. While the warrant was being obtained, Officer Cole watched Reddrick's house and saw someone enter at about 6:00 p.m. At about 6:30 p.m. several officers arrived at the home with the search warrant. Reddrick was arrested and the search carried out. The search uncovered a large quantity of cocaine, some of which was still cooking on the stove in a Pyrex mixing bowl, various drug paraphernalia and a number of unloaded firearms. The cocaine was later tested and government experts testified that 639.3 grams of cocaine base and 243.1 grams of cocaine hydrochloride (powder cocaine) had been recovered.

The search warrant was obtained based on information supplied by a confidential informant. The informant did not testify at the

probable cause hearing or provide an affidavit. Instead, the warrant was issued based on the testimony of police officer Jeffrey Ash concerning the information obtained by the informant.

The evening Reddrick was arrested, he was interviewed at about 7:50 p.m. by police detective Faust. The parties disagree substantially about exactly what transpired during the interview. Both sides agree that Reddrick told Faust that he had used cocaine earlier that afternoon. Faust testified, however, that Reddrick did not appear to be under the influence of drugs at the time of the interview. Reddrick and the government agree that Reddrick was given a "waiver of rights" form, which he signed. Faust testified that he also read the form to Reddrick. Faust and Reddrick agree that Reddrick had some difficulty in reading the form because he did not have his glasses with him. However, Faust testified that Reddrick was apparently able to read the form without his glasses and that "[h]e did hold the document out from his face and did look at the document for several minutes. And at which time he said he was done reading the document...." Hearing Tr. at 14. After Reddrick signed the form, Faust questioned him concerning the drugs found in his house. Faust then typed up a statement, which Reddrick signed. The statement read, in part:

> I am a cook, meaning that I cook powder cocaine and turn it into crack cocaine for several area people. People come to me and I cook their powder cocaine and turn it into crack and they give me money to do this. I have received anywhere from $200.00 to $2,000.00 for my services.

Reddrick App. at A–14. At the suppression hearing, though Reddrick did not deny that he cooked crack for a number of people in the area, he adamantly denied receiving money for doing so. The district court found Reddrick's testimony incredible and accepted Detective Faust's version of events.

## II. Validity of the Search Warrant

Prior to trial, Reddrick moved to suppress the evidence obtained during the search of his residence and requested an evidentiary hearing on the matter. The motion alleged that the warrant was granted on the basis of insufficiently reliable information and that the information provided in support of the warrant contained knowingly false statements or statements made with reckless disregard for the truth.

### A. Sufficiency of the Evidence of Probable Cause

The hearing to determine probable cause for the search warrant was quite brief. No affidavits were presented and the information supporting the warrant was provided only through the testimony of Officer Jeffrey Ash. The colloquy regarding probable cause proceeded as follows:

> Prosecutor: Now are you familiar with the facts of which to support probable cause for this search warrant?
>
> Ash: Yes sir.
>
> Prosecutor: And is this a case that has been actively worked by you or by members of your department?
>
> Ash: Yes sir it is.
>
> Prosecutor: Would you please relate to Judge Phillipe just the facts that you believe support the probable cause?
>
> Ash: I have, for the past couple off [sic] months, been working an investigation concerning a residence of this house of Lafayette Reddrick a/k/a Sonny. Three (3) purchases have been made from him, A felony amounts, and today the confidential informant, known to myself, who has been used and been reliable in the past, called at about 3:30 today and said that they had seen about 13 kilos of cocaine inside of the residence. They had been at the person's all evening and had just left there. We now have an officer sitting on the house and he hasn't seen another person leave and as far as I know he's still sitting there.
>
> Prosecutor: You mentioned a confidential informant.
>
> Ash: Yes sir.
>
> Prosecutor: You say that you've used him in the past, can you give us some idea of how many times he's been used and whether or not he's in every case been reliable?
>
> Ash: We've used the CI about 3 times that he's been involved with this guy right here.

Prosecutor: Okay.

Ash: All three times they've made a purchase from this gentleman.

Prosecutor: So all the information he's ever given you has been reliable?

Ash: Yes sir. Yes sir.

Reddrick App. at A–24–25.

The district court designated Magistrate Judge Kennard Foster to make a recommendation regarding the motion to suppress the seizure. Magistrate Judge Foster found that Ash's testimony adequately proved probable cause when assessed by evaluating the "totality of the circumstances" indicating that the informant's information is reliable. R. 25 at 11–12. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Under *Gates*, "[a]n affidavit [of probable cause] must provide the magistrate with a substantial basis for determining the existence of probable cause, and [a] wholly conclusory statement . . . fail[s] to meet this requirement." *Id.* at 239, 103 S.Ct. at 2332. Magistrate Foster based his reliability finding on: (1) the fact that the informant based his information on personal observation; (2) the fact that the informant identified the type and quantity of controlled substance observed and the location of the residence and (3) the informant's prior cooperation in three controlled buys from Reddrick. Thus, the magistrate concluded that "the level of detail provided by the informant—identification of the substance, the amount, his basis of knowledge, and the location—while minimal, is sufficient to supply probable cause." R. 25 at 14. The district court later adopted the magistrate's report and recommendation in its entirety. R. 29 at 5.

■■■ The task of an appellate court in reviewing the probable cause basis for issuance of a search warrant is "to determine whether there is substantial evidence in the record supporting the judge's decision to issue the warrant." *United States v. Lloyd,* 71 F.3d 1256, 1262 (7th Cir.1995). In *Lloyd* we recently reviewed some of the factors which suggest that an informant's information is sufficiently reliable to support the issuance of a warrant. These include: (1) firsthand observation by the informant; (2) degree of detail provided; (3) corroboration of the informant's information by an officer's independent investigation and (4) the fact that the informant testified at the probable cause hearing.

■■■ Here the evidence of reliability of the informant's information was sparse. While Officer Ash's testimony does report a firsthand observation of the drugs by the confidential informant, the informant apparently provided little detail regarding the drugs allegedly present in the house except for their quantity (which, in the event, turned out to be thirteen times too high).[1] There was, of course, no corroboration of the informant's information, nor did the informant testify at the probable cause hearing. Magistrate Foster correctly noted that "[t]o the extent that Officer Ash states that the informant provided reliable information in the past, it is an unsupported conclusion which does not demonstrate probable cause," R. 24 at 13.

The sparse evidence in this case contrasts with the evidence of probable cause available in other cases in which we have held that a search warrant properly issued. In *Lloyd,* for example, which involved a search for weapons, the informant gave detailed descriptions of both the residence and the locations of the guns within the residence. In *United States v. Pless,* 982 F.2d 1118, 1125 (7th Cir.1992), the informant knew details of the defendant's drug dealing trips and provided information which was corroborated by two other informants and by the officer's own investigation. Although in *United States v. Fairchild,* 940 F.2d 261, 265 (7th Cir.1991), the information provided by the informant was substantially similar to that provided here, the informant was not anonymous, the informant provided information that the defendant owned the motorhome to be searched and the target was a drug dealer who had already been arrested. In addition, the drug dealer's apartment had already been searched, uncovering illegal narcotics.

---

**1.** The magistrate judge stated that the informant "identified . . . the location of the residence," R. 24 at 12, but this statement is without support in the record.

By contrast, the only detail reported here with respect to the observed drugs was their amount. The informant did not testify at the probable cause hearing so that the magistrate judge could assess the informant's reliability nor did the informant provide a sworn affidavit. In these circumstances, the information from the informant alone could not have supported the issuance of a search warrant.

■ Here, however, there was more. Officer Ash testified that the informant had made three controlled buys of illegal drugs from Reddrick. The controlled buys in which the informant had participated provided significant evidence that Reddrick was a drug dealer. The Supreme Court has said that "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978). In this connection, our prior cases have recognized that, in issuing a search warrant, a magistrate "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir.1995), and that "in the case of drug dealers evidence is likely to be found where the dealers live," *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir.1991). Officer Ash's testimony concerning the controlled buys, which tended to establish that Reddrick was a drug dealer, combined with the informant's information, was enough to support issuance of the warrant.

■ Beyond challenging the magistrate's probable cause determination, Reddrick contends that the district court erred in denying him a hearing on the issue whether the warrant was obtained in bad faith. In order to obtain a hearing regarding a magistrate's issuance of a warrant, a defendant must show: (1) that the evidence presented to the magistrate contained false or misleading information; (2) that the false or misleading information was included intentionally or with reckless disregard for the truth and (3) that the misrepresentations or omissions were material to the determination of probable cause. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

■ Reddrick disputes the veracity of the statements attributed to the informant concerning *when* the informant was inside Reddrick's house. Reddrick claims in his brief that "in his motion, he claimed that no one had been in his home that day." Reddrick Br. at 26. In fact, no such statement is found in the motion, nor did Reddrick submit any affidavit nor *any evidence at all* in support of his request for a hearing. R. 25 at 11. Thus Reddrick's request for a hearing did not meet any of the Franks requirements and was properly denied by the district court in reliance on the magistrate's recommendation.[2]

### III. Suppression of Reddrick's Statement

■ Reddrick also appeals the district court's denial of his motion to suppress the statement he gave after his arrest on grounds that his statement was not voluntary. On appeal Reddrick bases this argument almost exclusively on his contention that Reddrick was not able to read the waiver of rights form and the typewritten statement because he did not have his glasses. The district court found, as a factual matter, based on an evidentiary hearing at which

---

**2.** Reddrick's reliance on testimony adduced at trial is unavailing in this regard, since he did not present such evidence to the district court in support of his request for a hearing. In any event, Officer Cole's testimony that no one left Reddrick's house between 5:00 p.m. and 6:00 p.m., when Reddrick returned, is not in conflict with Officer Ash's testimony that the informant said he had been at the house all evening and left at 3:30. First, the informant may well have meant 3:30 a.m., given the context of the state-ment. In any event, there is no evidence to contradict the possibility that Reddrick simply left his house between 3:30 p.m. and 5:00 p.m. Even had there been a conflict between Officer Cole's observations and the informant's statements, such a conflict would provide no basis for a finding of bad faith on the part of Officer Ash, who was in court at the probable cause hearing at 5:45 p.m. and could not possibly have known that Reddrick returned to his house at 6:00 p.m.

both Reddrick and Detective Faust testified concerning the interview, that Faust read Reddrick his *Miranda* rights aloud and that Reddrick himself read the waiver form, albeit with a bit of difficulty. Hearing Tr. at 65. These factual findings are not clearly erroneous, based as they were on Detective Faust's testimony and the district court's examination of Reddrick's glasses. Neither did the district court clearly err in its determination that Reddrick knew the contents of the typewritten statement before signing it. The court believed Faust's testimony that he read the contents of the statement to Reddrick, that Reddrick held the statement out at a distance and appeared to read it and that Reddrick did not complain of being unable to read the statement. The district court noted that the placement and quality of the defendant's signature on the statement indicated that he was able to see what he was doing. These factual findings, based almost entirely on credibility assessments, are certainly not clearly erroneous. Thus we find no error in the district court's denial of Reddrick's motion to suppress the statement.

IV. Application of the Cocaine Base Guideline

■ Reddrick raises three distinct challenges to the use of the crack guidelines to determine his sentence. First, he argues that "cocaine" and "cocaine base" are indistinguishable, as a matter of chemistry. This being the case, Reddrick argues, guideline provisions which attach different penalties to cocaine and cocaine base are ambiguous and the rule of lenity should be applied to require imposition of the lighter sentence. This argument is foreclosed by our recent opinion in *United States v. Booker*, 70 F.3d 488 (7th Cir.1995). In that case we ruled that, despite the identity of "cocaine" and "cocaine base" in scientific estimation, the legislative history shows that the terms were intended by Congress and the Sentencing Commission to refer to different forms of the drug. The term "cocaine base" was intended to refer to "crack"—a solid form of pure cocaine which is easily smoked. The term "cocaine" was intended to refer to all other forms of the drug, including powder cocaine (which is actually cocaine hydrochloride).

■ Next, Reddrick argues that the discriminatory racial impact of the notoriously disparate treatment of crack visa-vis other forms of cocaine violates the Equal Protection Clause. Reddrick acknowledges that "[e]very Circuit to address the matter has determined the ratio [of punishment for crack offenses to punishment for cocaine offenses] to be constitutional under equal protection considerations." Indeed, we very recently reiterated that our cases have rejected equal protection challenges to the disparity in sentences for offenses involving crack as against those involving cocaine powder. *United States v. Thomas*, 86 F.3d 647 (7th Cir.1996); *United States v. Blanding*, 53 F.3d 773 (7th Cir.1995).

■ In November 1995, Congress rejected an amendment proposed by the Sentencing Commission which would have eliminated the sentencing disparity. Reddrick alludes in his brief (filed before Congress' action) to a possible argument that, in light of the fact that the higher sentences for crack offenses are imposed particularly frequently on members of racial minorities and in view of new research tending to dispel the notion that the adverse societal effects of the different forms of cocaine are significantly different, "[i]f Congress fails to act to amend the cocaine/base guidelines, then Congress has reacted with a discriminatory intent sufficient to invoke due process and equal protection considerations." Reddrick Br. at 24.

Whatever the possible merits of constitutional arguments which might in principle be made in light of Congress' rejection of the Sentencing Commission's recommendation and more recent data on the effects of crack cocaine, Reddrick has not properly made any such arguments to this court. Reddrick's brief contains only a single sentence on the subject; he filed no reply brief; and he made no attempt to supplement his argument after Congress' November 1995 action. A mere allusion to a potential argument is not a sufficient means to raise an issue on appeal. We thus conclude that any equal protection argument based on Congress' rejection of the Sentencing Commission's recommendations has been waived. Our rejection of Red-

drick's equal protection argument is thus mandated by our precedent on the issue.

█ Finally, Reddrick argues that the evidence at trial was insufficient to support the jury determination that the cocaine upon which Reddrick's conviction was based was cocaine base (crack). This argument fails. At trial, the government presented the testimony of a forensic chemist who had analyzed the cocaine samples seized from Reddrick's house. The chemist specifically testified that the relevant samples contained cocaine in its base form. Trial Tr. at 117, 123, 127, 130. He testified that another sample contained cocaine hydrochloride ("powder cocaine"), Trial Tr. at 119, and that the tests he performed were sufficient to distinguish the two materials. The evidence was manifestly sufficient to support the verdict.

## V. Obstruction of Justice

█ Because the district court disbelieved Reddrick's testimony at the suppression hearing, the court applied an obstruction of justice enhancement to Reddrick's sentence under USSG § 3C1.1. The commentary to that guideline states that the enhancement is properly applied when a defendant has "provid[ed] materially false information to a judge or magistrate." Commentary, Note 3(f). Reddrick argues that any of his testimony which was not credited by the judge was not "materially false" because "[t]he statement sought to be suppressed was, at best, cumulative of the evidence offered by the government." This is certainly a peculiar argument to be advanced by someone who deemed the statement damaging enough to warrant the court's holding a suppression hearing to determine the statement's admissibility. A defendant who testifies at a suppression hearing may be subject to an obstruction of justice enhancement if he or she gives false testimony which is material to the decision whether the contested evidence should be suppressed. Having moved to suppress the evidence, he or she may not later claim that the evidence was of no importance to the government's case.

█ In this case, the contested evidence was Reddrick's statement to police. Reddrick contended that his statement was coerced because: (1) he could not read the form waiving his *Miranda* rights nor the statement itself without his glasses; (2) he was high on cocaine and marijuana during the interview; and (3) he was told by the police that things would go easier on him if he gave a statement. Further, he testified that he never told Detective Faust that he cooked cocaine for money, as related in the statement.

At the hearing, the district court found that "the testimony of the defendant is quite incredible, and for almost the entire part not truthful." Supp. Tr. at 63. Specifically, the court found that Reddrick was able to read the waiver form and typed statement, *id.* at 66; that there was no credibility to Reddrick's assertion that he "was told by anyone that things would be easier on him or that the police or prosecution would go easy on him if he gave them a statement," *id.* at 68; and that he "d[id] not find Mr. Reddrick's testimony about the level of his intoxication to be credible." *Id.* at 70. With regard to Reddrick's "sworn statement that he was told by the Anderson police that what was being written on the written statement was that he was a cook and did not refer to cooking cocaine," the court found "no credibility to that statement either." *Id.* at 68–69. Given these specific findings that Reddrick lied as to nearly everything he said in support of his motion to suppress the statement, his challenge to the obstruction of justice enhancement borders on the frivolous.

## VI. Impact of *United States v. Bailey*

In a supplemental submission, Reddrick raises the issue of the effect of the recent Supreme Court decision in *Bailey v. United States*, —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), on this case. In *Bailey*, the Supreme Court invalidated this circuit's prior interpretation of 18 U.S.C. § 924(c) and narrowed the interpretation of the term "use" in that statute to require a showing of "active employment" of the firearm. The parties agree, as do we, that the facts of this case do not support the § 924(c) conviction under this interpretation. Therefore, we must vacate the conviction and sentence under 18 U.S.C. § 924(c).

**1284**

VII. Conclusion

We AFFIRM the conviction for possession of cocaine base with intent to distribute and uphold the application of the cocaine base guideline and obstruction of justice enhancements at sentencing. We VACATE the defendant's conviction under 18 U.S.C. § 924(c) and REMAND the case to the district court for resentencing.

CUDAHY, Circuit Judge, concurring:

The rationality of the 100:1 crack/powder ratio and its implications for equal protection will no doubt be the subject of continuing examination both within the judiciary and without. The enduring constitutional viability of the crack/powder distinction has been questioned by at least two judges in other circuits on grounds similar to those to which Reddrick alludes. In concurring opinions, these judges have suggested that new information might undermine the rationality of the extraordinary sentencing disparity. *United States v. Smith*, 73 F.3d 1414, 1418 (6th Cir.1996) (Jones, J., concurring); *United States v. Then*, 56 F.3d 464, 466 (2d Cir.1995) (Calabresi, J., concurring). The Ninth Circuit, on the other hand, has recently rejected such a prospect, stating that "[w]e do not agree that the Commission's report, or Congress's decision to reject it, affects the precedential value of our ruling that Congress had a rational basis for the 100:1 ratio." *United States v. Jackson*, 84 F.3d 1154 (9th Cir. 1996).

The "no longer rational" argument rejected in Jackson may be distinct from an argument based on discriminatory intent. In that regard, Judge Calabresi wrote in his concurrence:

> If Congress, for example, though it was made aware of both the dramatically disparate impact among minority groups of enhanced crack penalties and of the limited evidence supporting such enhanced penalties, were nevertheless to act affirmatively and negate the Commission's proposed amendments to the Sentencing Guidelines (or perhaps were even just to allow the

100–to–1 ratio to persist in mandatory minimum sentences), subsequent equal protection challenges based on claims of discriminatory purposes might well lie.... As the Supreme Court has pointed out, facially-neutral legislation violates equal protection if there is evidence that the legislature has "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

*Then*, 56 F.3d at 468.

Whether there could be a basis for the sort of argument suggested by Judge Calabresi is surely unclear. But even without it, the extraordinary impact of the 100:1 ratio will provoke examination and reexamination however many efforts are made to lay the matter to rest.